## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**PATTI STEVENS-RUCKER, Administrator**
**of the Estate of Jason White, Deceased**

      **Plaintiff,**

                                    **Case No.: 2:14–CV–2319**
     **v.**                                  **JUDGE SMITH**
                                       **Magistrate Judge Deavers**

**CITY OF COLUMBUS,** *et al.*,

      **Defendants.**

## <u>OPINION AND ORDER</u>

This matter is before the Court upon the Motion for Summary Judgment of Defendants the City of Columbus ("Columbus"), Sergeant John Frenz, and Officer Dustin McKee of the Columbus Police Department ("Defendants") (Doc. 57).  Plaintiff opposed Defendants' Motion (Doc. 86) and Defendants replied in support (Doc. 95).  Additionally pending is Plaintiff's Motion for Leave to File a Surreply (Doc. 96) and Defendants' response to the Motion for Leave (Doc. 97).  The Motions are now ripe for review.  For the following reasons, Plaintiff's Motion for Leave is **GRANTED** and Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

This case arises out of the death of Plaintiff's decedent Jason White ("White") on November 17, 2013 in Hilliard, Ohio.  White died after sustaining gunshot wounds from defendant Sergeant Frenz ("Frenz"), from defendant Officer McKee ("McKee"), and, potentially from former defendant Officer Jason Alderman ("Alderman").

On November 17, 2013, White entered the home of Ashley Cruz at around 5:00 a.m. while Cruz was sleeping on the couch with the door unlocked.  (Doc. 58, Cruz Aff. at ¶¶ 2–5).  Cruz woke up when White entered and observed an African American man wearing no shirt, jeans, and a camouflage fishing hat.  (*Id.*).  Cruz did not recognize White.  (*Id.*).  White was holding a large kitchen knife and was sliding his hand on the blade.  (*Id.* at ¶ 6).  Cruz turned on the lights and told White to leave her apartment.  (*Id.* at ¶¶ 7–8).  White did not leave, but just kept looking around Cruz's apartment.  (*Id.* at ¶¶ 8–9).  When Cruz's baby began crying, Cruz told White to stay where he was while she retrieved her baby.  (*Id.* at ¶¶ 9–10).  When Cruz returned to the room, she asked if White wanted water, food, or a coat but White appeared confused and asked Cruz what she was doing in his home.  (*Id.* at ¶¶ 13–15).  White then began exiting and reentering the apartment stating that something happened to him and that something was not right.  (*Id.* at ¶¶ 17–20).  When White eventually left the apartment and walked to a nearby landing, Cruz shut the door, locked the door, and woke up her boyfriend.  (*Id.* at ¶¶ 21–23).  Once the door was closed, White tried the handle again.  (*Id.*).  Cruz then called 911, relaying the earlier events.  (Doc. 88, Manually filed CD of Cruz 911 Call ("Cruz 911 Call")).  Cruz informed the operator that White may have been on drugs because White was not making any sense.  (*Id.*).  While Cruz was on the phone with 911, White continued coming back to Cruz's door, trying to turn the knob and pounded on other doors in the area.  (Doc. 88, Cruz 911 Call; Doc. 58, Cruz Aff. at ¶¶ 26–27).

## A.    Officer Alderman

Alderman was the first on the scene and recalls hearing a 33A call,[1] dispatching Wagon 158[2] to Cruz's apartment.  (Doc. 83-1, Alderman Dep. at 40; Doc. 70, Alderman Aff. at ¶¶ 22,

---

[1] A 33A call means that there is a report of a person with a knife.  (Doc. 83-1, Alderman Dep. at 40).

29).  Alderman heard that a caller had informed 911 that there was a man with a knife banging on her door.  (Doc. 83-1, Alderman Dep. at 42–43; Doc. 56, Manually filed CD of Police Audio #001 ("Columbus Audio")).  Alderman does not recall hearing that White's speech was incoherent but the dispatcher did inform Wagon 158 that White was "out of it.  He was talking but it made no sense."  (Doc. 83-1, Alderman Dep. at 43; Doc. 56, Columbus Audio #001).  While Wagon 158 was in transit to Cruz's apartment, Alderman received an update that White was attempting to enter Cruz's home, meaning there was possibly a burglary attempt which requires two officers at a minimum.  (Doc. 83-1, Alderman Dep. at 44; Doc. 56, Columbus Audio #005, #008).  Frenz recalls hearing that there was a man-with-a-knife call and that the man had entered an apartment with a knife in his hand.  (Doc. 83-2, Frenz Dep. at 50).  As the supervising officer of the precinct, Frenz did not plan on responding to the call, but told his officers to enter with lights and sirens.  (*Id.* at 51).  Alderman responded to the call for additional help and drove to Cruz's apartment complex because he was only two minutes away.  (Doc. 83-1, Alderman Dep. at 63–64; Doc. 56, Columbus Audio #008).  Alderman saw White as he pulled in to the area.  (Doc. 83-1, Alderman Dep. at 65).  At the time, White was not carrying a weapon.  (*Id.*).  Alderman approached White with his gun drawn in a breezeway as the two men faced each other.  (*Id.* at 65, 70–71).  Alderman informed dispatch that he had had a suspect at gunpoint.  (Doc. 56, Columbus Audio #010).

Alderman was 45–60 feet away from White at first and told White to show his hands.  (Doc. 83-1, Alderman Dep. at 72–73).  White complied with this order and Alderman approached.  (*Id.*).  Alderman asked White to turn around and White complied.  (*Id.* at 76–77).  However, when White turned around, he dropped his hands to his side.  (*Id.*).  Alderman saw at

---

[2] Wagon 158 contained Officers Joel Mefford and Brian Smith.  (Doc. 67, Mefford Aff. at ¶ 15).

least two knives in White's back pockets.  (*Id.*).  Alderman yelled at White to put his hands back up but White did not comply.  (*Id.*).  Instead, White turned around—still unarmed—and faced Alderman and continued to ignore Alderman's commands.  (*Id.* at 78–79).  Alderman then withdrew his Taser while keeping his gun drawn in his other hand.  (*Id.*).  After White did not comply with another command to get on the ground, Alderman fired his Taser at White from about 10 to 15 feet away then put his Taser away.  (*Id.* at 80–81).  White tensed up and fell backwards but got up swiftly with a large kitchen knife in his hand.  (*Id.* at 81–83).  White then started moving toward Alderman with the knife drawn and the blade pointed up.  (*Id.*).  Alderman notified dispatch that White was running towards him.  (Doc. 56, Columbus Audio #012).  Alderman then fired four shots at White from eight to ten feet away.  (Doc. 83-1, Alderman Dep. at 83–84).[3]  After Alderman fired his four shots, White turned and ran the opposite direction.  (*Id.* at 86).  Alderman did not chase White as he was unfamiliar with the area, relatively new to the force, and was shaken from discharging his weapon.  (Doc. 83-1, Alderman Dep. at 87).  Another officer, Officer John Groom, arrived on the scene and notified the dispatcher that Alderman fired shots.  (Doc. 56, Columbus Audio #016).  Groom secured Alderman who was shaken by the incident rather than chase White or speak to Cruz.  (Doc. 84-4, Groom Dep. at 29).  Groom stayed with Alderman while Sergeant Siford went to speak to Cruz regarding her report.[4]  (*Id.* at 33).  Alderman had no further contact with White and did not participate in the later search for White.  (Doc. 83-1, Alderman Dep. at 91).

---

[3] It is not clear if any of Alderman's bullets struck White, but a determination of that fact is not necessary to the resolution of this case.  (Doc. 83-1, Alderman Dep. at 85).

[4] It is unclear why Plaintiff states that "none of these 20-30 responding officers contacted Ashley Cruz . . . until well after Jason White had been shot to death almost an hour later," when Officer Groom clearly testified that an officer went to Cruz's apartment on the same page of Officer Groom's deposition transcript cited by Plaintiff.  (Doc. 86, Mem. Opp. at 12).  An unidentified officer also noted that he was with Apartment 302, the address for Ashely Cruz, at 5:25:45 a.m., after Alderman's interaction with White but well before Frenz's interaction with White.  (Doc. 56,

4

### B.     Officer Frenz

The next officer to come into contact with White was Frenz.  After hearing that Alderman had a suspect at gunpoint, Frenz had ordered a "10-3" run, meaning a run for an officer in trouble.  (Doc. 83-2, Frenz Dep. at 51).  A "10-3 run" means that every officer able to respond in the area would go to the location to help.  (*Id.* at 52).  Frenz left the station and met up with McKee and Officer Jeffrey Kracht at Saddlebrook apartments, a separate, but nearby apartment complex, where Frenz planned to set up a perimeter.  (*Id.* at 87–88).  After parking his vehicle and instructing Kracht and McKee to set up the perimeter, Frenz spotted White crouched by the corner of building, hiding his hands, and peering around the corner of the building.  (*Id.* at 93–94).  Because Alderman had shot at White and White had entered an apartment with a knife, Frenz drew his gun and his flashlight and ordered White to show his hands.  (*Id.*).  Although Frenz had heard that White's speech was incoherent, Frenz stated that he was more concerned "that [White] was dangerous more than considering a specific mental disturbance, simply not knowing what was going on with him."  (*Id.* at 95).  Frenz ordered White to show his hands multiple times but White did not comply and instead stood up and moved around the building.  (*Id.* at 97).  On the south side of the apartment building, there was a small area partitioned off by a fence which contained air conditioning units.  (*See* Docs. 87-8, 87-9, 87-11, 87-12).  The fenced off area had openings at both the western and eastern ends.  (Doc. 83-2, Frenz Dep. at 101).  White entered on the eastern side, moving west.  (*Id*. at 100).  The fence was short, maybe two to three feet.  (*Id.* at 101–102; Doc. 83-8, Kracht Dep. at 36).

Frenz approached the fence from the eastern end while White crouched down inside and behind the fence.  (Doc. 83-2, Frenz Dep. at 102).  Frenz looked through the opening and saw

---

Columbus Audio #034, #408).  Additionally, an officer aired that he had made contact with the 911 caller at Apartment 302 before White's death.  (*Id.* at #048).

White crouched down.  (*Id.*).  Frenz could not see White's hands so he again ordered White to show his hands.  (*Id.* at 104).  White did not show his hands but instead, stood up and faced Frenz while holding a knife.  (*Id.*).  At 5:43:56 a.m., Frenz aired that he had the suspect in the back.  (Doc. 56, Columbus Audio #408).  At the time White stood up and faced Frenz, White was twenty feet away from Frenz.  (Doc. 83-2, Frenz Dep. at 105).  Frenz told White to drop the knife and get on the ground which White did not do.  (*Id.* at 104).  Frenz, still at the eastern end of the fence enclosure, moved slightly south when he saw an officer west of his position and heard a reminder to avoid crossfire.  (*Id.* at 105).  Officer Kracht had taken up position by the fence, approaching from the west end.  (Doc. 83-8, Kracht Dep. at 37–38).  He observed that White had his back to the siding of the apartment building within the fenced in area holding a knife to his side.  (*Id.* at 35).  It is unclear from Kracht's deposition where he observed Frenz, but his affidavit states that he saw Officer Frenz at the eastern edge of the fence enclosure.[5]  (Kracht Aff. at ¶ 50).  Seeing that Frenz had White at gunpoint, Kracht holstered his gun and withdrew his Taser.  (Doc. 83-8, Kracht Dep. at 37).  Frenz stated that he moved so that he was not standing opposite of the other officer, using the eastern end of the fence for cover and keeping it between him and White.  (Doc. 83-2, Frenz Dep. at 106–07, Ex. 19).[6]  Kracht was positioned

---

[5] Plaintiff argues that "Kracht testified that he took up a position at the southwest corner of the enclosure, which is by all accounts within feet of where Frenz was located."  (Doc. 96, Surreply at 12 (citing Kracht Dep. 37:23-38:2, 42:13-20)).  However, after a careful review of the depositions of both Kracht and Frenz, there is no evidence that Frenz was within feet of Kracht or that "Kracht was standing very near Frenz when Frenz shot Jason."  (*Id.*).  Rather, as Plaintiff notes, Frenz started at "the northeast corner of the enclosure" before "***moving south***" and that "Kracht testified that he took up a position at the southwest corner of the enclosure."  (*Id.* (emphasis in original)).  How Frenz—who moved south from the northeast corner to the southeast corner of the enclosure—could be "very near" an officer at the southwest corner is unexplained by Plaintiff.  There is no evidence that Frenz ever moved west of the center of the enclosure or even any more than mere feet west of the southeastern corner.
[6] Frenz noted he used the portion of the fence visible in Exhibit 19 as cover once he moved.  (Doc. 83-2, Frenz Dep. at 107).  The portion of fence is the eastern side of the enclosure.  (*See* Doc. 87-12, Photo 19).  Frenz also indicated that he was near the bumper of a car in photo 19.  (*Id.*).  It is unclear to which vehicle he is referring as there are at least two bumpers visible in the photo.  (*Id.*).

near the opening on the western end and White was in the middle of the fenced in area. (Doc. 83-8, Kracht Dep. at 42–43).

White continued to stare at Frenz. (Doc. 83-2, Frenz Dep. at 108; Doc. 83-3, McKee Dep. at 76). Kracht then deployed his Taser toward White's right side. (Doc. 83-8, Kracht Dep. at 44–45) The Taser was not effective. (*Id.*). After Kracht deployed his Taser, White turned to his left and began to run eastbound toward the opening he originally entered. (Doc. 83-8, Kracht Dep. at 45–46). Frenz stated that White started moving toward him, moving eastbound along the wall toward the east exit of the enclosure which Frenz interpreted as White coming at him. (Doc. 83-2, Frenz Dep. at 108–109).[7] In order to reach Frenz with a knife, White would have had to exit the enclosure then turn to his right or southbound. (*Id.* at 110). Frenz did not wait for White to reach the exit of the enclosure. (*Id.*). Frenz states that he moved further west as White moved east and fired three shots at White while White was still inside the enclosure, striking him once in the left shoulder area. (*Id.* at 110, 112; Doc. 79, Frenz Aff. at ¶ 124). Frenz believes he was six to eight feet from White and standing in the grassy area on the south side of the enclosure when he fired. (Doc. 83-2, Frenz Dep. at 70, 78; Doc. 79, Frenz Aff. at ¶ 132).[8] At the time Frenz shot White, McKee was maybe thirty yards away from Frenz.[9] (Doc. 83-3, McKee

---

[7] Plaintiff argues that following Kracht's deployment of the Taser, White "turned toward the east exit *away* from Kracht and Frenz." (Doc. 86, Mem. Opp. at 15 (emphasis in original)). It is not clear how Plaintiff determined that White was turning away from Frenz as there is no evidence which suggests that Frenz was anywhere but east of White's position at the time of the Taser deployment.

[8] Plaintiff attempts to argue that the distance between the two is in dispute because "Sgt. Frenz was approximately 15-20 feet from Jason White and separated by a privacy fence, which is well beyond this reactionary gap." (Doc. 86, Mem. Opp. at 17–18). The Court agrees that White and Frenz were 15 to 20 feet apart at some point in time in their encounter. (Doc. 83-2, Frenz Dep. at 105). However, there is nothing in the record that contradicts Frenz's testimony that White was six to eight feet away when Frenz discharged his firearm or that White moved toward Frenz before Frenz discharged his firearm. (*Id.* at 70, 78).

[9] There is no evidence in the record to support Plaintiff's assertion that "Frenz was accompanied by Kracht and McKee when he fired" as McKee testified he was thirty yards away. (Doc. 86, Reply at 17; Doc. 83-3, McKee Dep. at 78). Furthermore, according to all three officers, McKee was chasing White from behind Frenz and Kracht in the ensuing chase. (Doc. 83-8, Kracht Dep. at 49–50; Doc. 83-2, Frenz Dep. at 115–17, Doc. 83-3, McKee Dep. at 78–80).

Dep. at 79).  McKee recalls seeing White near the eastern enclosure and Frenz in the grass or mulch that is visible in Photo 18.  (Doc. 83-3, McKee Dep. at 76; Doc. 87-11, Photo 18).  After Frenz shot White, White stumbled back and leaned against the wall.  (Doc. 83-2, Frenz Dep. at 110).  In Photos 18, 19, and 22, there is clear evidence of blood on the wall near the eastern exit of the enclosure and outside of the enclosure on the southeastern corner of the apartment building.  (Docs. 87-11, 87-12, and 87-10).  McKee saw White's blood splatter on to the wall after Frenz fired his weapon.  (Doc. 83-3, McKee Dep. at 78).  When Frenz saw White lean against the wall, he knew he had made contact and fired no more shots.  (Doc. 83-2, Frenz Dep. at 113).  At 5:44.17, McKee aired that shots were fired.  (Doc. 83-3, McKee Dep. at 77; Doc. 56, Columbus Audio #409).  White then fled, making it around the southeastern corner of the building then continuing north along the building before running westbound through a breezeway.  (Doc. 83-2, Frenz Dep. at 115–16; Doc. 83-3, McKee Dep. at 79; Doc. 83-8, Kracht Dep. at 49–50).  McKee, Kracht, and Frenz were all pursuing White.  (Doc. 83-8, Kracht Dep. at 49–50; Doc. 83-2, Frenz Dep. at 115).

## C.    Officer McKee

McKee does not recall the immediate moments after Frenz shot White, but recalls that he was soon behind White, running northbound on Gables Lake Boulevard.  (Doc. 83-3, McKee Dep. at 80).  McKee did not follow Frenz, Kracht, and White around the east side of the building, but instead ran northbound on Gables Lake and saw White come west out of the breezeway then head north.  (*Id.*).  As White turned north, McKee pursued him.  (*Id.*).  At the time, Frenz was still in front of McKee, but was to McKee's left and out of McKee's sight-line to White.  (*Id.*).  Kracht was even with Frenz and was aware that McKee was in the area, although he was not sure exactly where McKee was at that time.  (Doc. 83-8, Kracht Dep. at 53–54).  Frenz was unaware McKee was behind him.  (Doc. 83-2, Frenz Dep. at 117).  At the time,

8

Officer Joel Mefford was approaching Gables Lake from the west and observed White running. (Doc. 84-1, Mefford Dep. at 44–46). Mefford observed that White was limping but still maintaining a good running pace. (*Id.*). He further noted that there was visible blood on the side of White's body and White was still holding a knife in his right hand. (*Id.*). McKee was aware that other officers were in the area, but he was not aware how many were on scene at that time. (Doc. 83-3, McKee Dep. at 88). When White was roughly 20 to 25 feet away and running away from McKee, Frenz, and Kracht, McKee fired two shots at White's back. (Doc. 83-3, McKee Dep. at 61–62). McKee slowed while running, crouched down, and shot with both hands. (*Id.* at 64). One of McKee's bullets may have struck White in the lower left back ("Wound C"). (Doc. 83-3, McKee Dep. at 100; Doc. 64, Daniels Aff. at ¶¶ 25–32).

Frenz, not knowing where the shots came from, crouched and slowed down, stopping his chase. (Doc. 83-2, Frenz Dep. at 117–118). Kracht yelled "Dustin!" at McKee to indicate that his shots could have hit Frenz or Kracht then continued giving chase with McKee. (Doc. 83-8, Kracht Dep. at 56–57; Doc. 83-3, McKee Dep. at 80–81). While giving chase, McKee continued to order White to drop the knife and stop running. (Doc. 83-3, McKee Dep. at 82–83). White next took a right turn eastbound through a breezeway. (*Id.* at 81). McKee slowed down in the breezeway to avoid an ambush and continued to advance with his gun drawn. (*Id.*). At the end of the breezeway, McKee observed that White had stopped and turned to face the breezeway. (*Id.* at 82). McKee continued out of the breezeway to face White. (*Id.* at 82). When McKee stopped chasing, he and White were "no more than 15 feet" apart. (*Id.* at 83–84). McKee had his gun drawn and held high, but his finger was not on the trigger. (*Id.* at 84). White did not say anything to McKee and had a blank facial expression. (*Id.* at 85). Kracht rounded a corner and saw White standing still, facing him but does not recall seeing McKee. (Doc. 83-8, Kracht Dep.

at 59).  White was holding a knife and Kracht had his gun drawn.  (*Id.* at 60–61).  Officer Merino also arrived on the scene while White was still standing.  (Doc. 83-9, Merino Dep. at 24–26).

McKee then fired two shots at White's center mass.  (Doc. 83-3, McKee Dep. at 85).  Even though McKee was fifteen feet away from White, McKee testified that he felt that White would have been able to close that distance before McKee would be able to put his finger on the trigger and fire.  (*Id.*).  McKee testified that he felt that White was going to attack him.  (*Id.* at 95).  McKee knew he hit White with at least one shot because White fell to the ground.  (*Id.* at 86).  Kracht does not recall exactly what he saw when White was shot, but recalls White on the ground on his back.  (Doc. 83-8, Kracht Dep. at 62).  Officer Merino saw White standing with a knife in his hand then saw him fall to the ground, first to his knees then to his back.  (Doc. 83-9, Merino Dep. at 24–27).

McKee held his position then states that he saw White began to get back up from a prone position.  (Doc. 83-3, McKee Dep. at 86).  White was lying on his left side with his right arm underneath his body using his left arm to push himself off of the ground.  (*Id.*).  Kracht does not recall seeing White trying to get up off of the ground.  (Doc. 83-8, Kracht Dep. at 62).  McKee fired two more shots at White, fatally striking him in the left chest with one of the shots.  (Doc. 83-3, McKee Dep. at 86–87).

### D.    Actions of the Officers Following the Final Shots

Numerous other officers immediately arrived on the scene.  (Doc. 83-3, McKee Dep. at 86–87; Doc. 83-9, Merino Dep. at 27; Doc. 83-2, Frenz Dep. at 121).  Frenz and Kracht saw White putting the knife up to his own neck while lying flat on his back.  (Doc. 83-2, Frenz Dep. at 121; Doc. 83-8, Kracht Dep. at 65).  Once White stopped moving, Kracht removed the knife from White's hand, rolled White onto his stomach, and put White in handcuffs.  (Doc. 83-3, McKee Dep. at 86–87; Doc. 83-8, Kracht Dep. at 65–67; Doc. 83-2, Frenz Dep. at 121).  Kracht

felt safe to approach White because he presumed that White was dead.  (Doc. 83-8, Kracht Dep. at 67).  Merino could hear White gasping for air and could see blood pumping out of White's chest.  (Doc. 83-9, Merino Dep. at 28).  Merino stated that he held White's leg while Kracht removed the knife from White's hand and helped Kracht turn White over.  (*Id.* at 30–31). Merino could tell that White was still breathing when he was on his stomach being handcuffed. (*Id.*).  At 5:45:49, an officer tells dispatch the officer is going to need a medic.  (Doc. 56, Columbus Audio #413).  In the same recording an officer aired that they were going to get a squad to the suspect at 5:45.  (Doc. 56, Columbus Audio #413).[10]

No officer attempted to provide medical aid to White.  (Doc. 83-9, Merino Dep. at 33–34; Doc. 83-6, Shaw Dep. at 24; Doc. 83-2, Frenz Dep. at 121).  Merino left White and secured the scene to make sure that all necessary evidence could be collected.  (Doc. 83-9, Merino Dep. at 35).  Merino understood that he was leaving White to die in the grass when he got up and walked away.[11]  (Doc. 83-9, Merino Dep. at 34).  About 15 minutes passed between when officers calling for EMS and when Lieutenant Shaw of Columbus Fire and Rescue arrived.  (Doc. 83-6, Shaw Dep. at 21).  Columbus Fire and Rescue was not first on the scene, however, as a paramedic from the Norwich Township Fire Department was already next to White.  (*Id.* at 17). The Norwich paramedic had already determined that White had no pulse and was not breathing. (*Id.*).  Shaw recommended that they turn White over and check him for a pulse and breaths which they did not find.  (*Id.* at 17, 25–26).  Shaw determined that no medical intervention

---

[10] After White was handcuffed, McKee was walked to his cruiser by another officer and was then taken by officer support to the training academy.  (Doc. 83-3, McKee Dep. at 89–90).  Kracht—presumably still believing that White was deceased—walked away from the scene southbound to calm himself.  (Doc. 83-8, Kracht Dep. at 70).  A detective interviewed Kracht at the scene.  (*Id*. at 74).

[11] Defendant objected to this question during deposition testimony but the Court finds no evidentiary objection appropriate to exclude it.  (Doc. 83-9, Merino Dep. at 34).  However, the Court notes that Plaintiff's characterization of Merino's testimony as indicative of the state of mind of every officer on the scene is incorrect.  (*See* Doc. 86, Mem. Opp. at 48 ("The Columbus police officers understood that they 'were leaving Jason to die there in the grass when [they] got up and walked away from him.'") (citing Doc. 83-9, Merino Dep. at 34)).

would save White and pronounced that White was deceased within five minutes of his arrival. (*Id.* at 28–29).

Plaintiff, White's mother and administrator of his estate, filed this suit in 2014 alleging that Alderman, Frenz, and McKee used excessive force in violation of 42 U.S.C. § 1983, and that Alderman, Frenz, and McKee were deliberately indifferent to White's serious need for medical care in violation of 42 U.S.C. § 1983.  (Doc. 1, Compl. at ¶¶ 37–49).  Plaintiff also sued the City of Columbus and Chief of Police Kim Jacobs for failure to properly train or supervise the officers and for having customs or policies ratifying constitutional violations under 42 U.S.C. § 1983.  (*Id.* at ¶¶ 50–58).  Plaintiff also brought wrongful death, assault and battery, and intentional infliction of emotional distress claims against each of the defendants.  (*Id.* at ¶¶ 59–72).  Plaintiff dismissed Chief Jacobs on July 7, 2015, and Alderman on September 18, 2015. (Docs. 34, 36).  The remaining Defendants now move for summary judgment on all of Plaintiff's remaining claims.

## II.        STANDARD OF REVIEW

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

## III.     DISCUSSION

Defendants moved for summary judgment, arguing that Frenz and McKee are entitled to qualified immunity on Plaintiff's excessive force and deliberate indifference claims. Defendants further argue that there is no municipal-liability claim because there were no underlying constitutional violations, that Plaintiff cannot identify a specific custom or policy which caused a violation of White's constitutional rights, and that Columbus' training of its officers was more than adequate. Last, Defendants argue that Frenz, McKee, and Columbus are immune from Plaintiff's state-law claims under Ohio Revised Code § 2744. Plaintiff's specific responses to each argument will be discussed below after other preliminary matters are decided.

### A.     Preliminary Matters

Before the Court addresses the merits of these defenses, Plaintiff argues that the affidavits relied upon by Defendants should be stricken or given little weight and moved for leave to file a

surreply.  It is true—and time-consuming for the Court—that Defendants did not cite a single deposition in the Motion for Summary Judgment.  However, Defendants are not legally obligated to rely on deposition testimony where the only questions asked in those depositions were those asked by Plaintiff's counsel.[12]  A deposition serves the important role of allowing a party to elicit sworn testimony from an opponent's witness.  However, the inverse is that a party's opponent may use an affidavit to elicit sworn testimony for its own witness.  Provided that the affidavit testimony is consistent with the deposition, a party is not obligated to rely on deposition testimony at all.  Plaintiff points to one example where the deposition testimony of Thomas Paige and Eric Pilya are contradictory to their affidavits and claims that "the attorneys for Defendants have chosen to painstaking craft lengthy affidavits that contradict significant portions of the testimony."  (Doc. 86, Mem. Opp. at 32–34).  Plaintiff's highlighting of two instances of inconsistency over twenty-two affidavits is insufficient for the Court to strike all of the affidavits.  Rather than strike every affidavit, the Court primarily uses the deposition testimony in determining the undisputed facts and will give no value to affidavit statements which conflict with prior sworn testimony.  *See Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) ("a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony."); *but see Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) (finding that parties may supplement incomplete deposition testimony with affidavits).  Of course, to the extent an affidavit contradicts deposition testimony on a material fact; the Court is already constrained to construe such a fact in favor of the Plaintiff.

---

[12] In moving for summary judgment, a party must support its assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits **or** declarations, . . . **or** other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A) (emphasis added).

As for Plaintiff's Motion for Leave to File a Surreply, this Court grants such requests "for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). It is common for this Court to grant leave where a reply raises new legal arguments. *See e.g., Burlington Ins. Co. v. PMI Am., Inc.*, 862 F. Supp. 2d 719, 726 (S.D. Ohio 2012), *order clarified*, No. 2:08-CV-1054, 2012 WL 1665867 (S.D. Ohio May 10, 2012) (Sargus, C.J.); *Thompson v. Transam Trucking, Inc.*, 750 F.Supp.2d 871, 884 (S.D. Ohio 2010) (Frost, J.). In this case, Defendants submitted a forty-page reply citing deposition testimony for the first time. The Court feels that Plaintiff has shown good cause and should be afforded the opportunity to address this record evidence even though the underlying arguments may not have been novel when raised in Defendants' reply. Accordingly, the Court **GRANTS** Plaintiff's Motion for Leave to File a Surreply on the docket as Doc. 96-1. The Court will now address the merits of this case.

## B.     Qualified Immunity

It is well-established that "[p]olice officers are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). Qualified immunity protects all but "the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 565 U.S. at 546 (internal quotations omitted). If officers of reasonable competence could disagree on the issue, then qualified immunity should be recognized. *Mullins*, 805 F.3d at 765 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In order to determine if an officer's actions are entitled to qualified immunity, the Court employs a two part test: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such that a reasonable official would

understand that what he is doing violates that right." *Mullins*, 805 F.3d at 765 (internal quotations omitted).  Although the Court views the facts in the light most favorable to the Plaintiff, the Court must not give "plaintiff the benefit of inferences and suppositions that are not . . . supported by the record facts." *Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009).  Courts are free to analyze the prongs in either order as both must be met for qualified immunity to apply. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In determining the reasonableness of an officer's actions, the Sixth Circuit uses a "'totality of the circumstances'" test. *Mullins*, 805 F.3d at 765 (quoting *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007)).  The Sixth Circuit has identified three non-exhaustive factors to consider: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)).  While the Sixth Circuit has described these factors as non-exhaustive, it has stated that "[i]n excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" *Mullins*, 805 F.3d at 766 (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005) (emphasis in original)).

The right to be free from excessive force is clearly established as a protection given by the Fourth Amendment.  *Mullins*, 805 F.3d at 765.  However, while the general right to be protected from excessive force is established, the Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Instead, "[t]he relevant, dispositive inquiry in determining whether a

right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). An officer's action is "'assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson*, 555 U.S. at 244 (quoting *Wilson*, 526 U.S. at 614).

The Sixth Circuit employs a segmented approach to excessive force claims where the reasonableness of each shooting is analyzed independently of the other shootings *Greathouse v. Couch*, 433 F. App'x 370, 372 (6th Cir. 2011). The Sixth Circuit has warned that "'[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n. 9 (6th Cir. 1996) (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)). Accordingly, the Court must separate each set of shots by Frenz and McKee to determine if the circumstances at the time of each shooting warranted the force used.

### 1. Sergeant Frenz

Defendants argue that Plaintiff cannot satisfy either prong of the qualified immunity test for Frenz's interaction with White because Defendants allege Frenz acted reasonably when he fired his weapon at White. Plaintiff argues that Frenz's shooting was not reasonable because there is a question of fact about whether White posed a significant immediate threat.

Before considering the legal merits of Frenz's immunity, the Court notes that it relies on the facts as stated above and to the extent there was any doubt in the facts, those were construed in favor of the Plaintiff. However, the Court is wary that Plaintiff cannot create a question of material fact "by asserting as a fact that the defendant did not have a requisite reasonable state of mind, or that the victim, in hindsight, did not in fact present a danger." *Murray-Ruhl v.*

*Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007). The Court is only concerned with the objective reasonableness of Frenz's actions, not his subjective state of mind. *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016), as amended (May 18, 2016) ("we consider the specific factual circumstances known to the officer to determine whether a reasonable officer would have known that her conduct violated that right.") (citing *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015)); *see also Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004) (finding a court must consider qualified immunity by analyzing the situation the officer confronted).

With that in mind, Defendants argue that the three reasonableness factors—(1) severity of the crimes; (2) whether White was actively resisting arrest or fleeing; and (3) immediacy of the threat—all favor Frenz, and note the specific factual circumstances of which Frenz knew at the time. The Court will first address each of the three factors in turn.

### a. Severity of the Crimes

Defendants argue that this factor weighs in favor of Frenz because Frenz was aware that White had likely committed two first-degree felonies: aggravated burglary and felonious assault against a peace officer. Plaintiff argues that the only crimes actually committed by White were misdemeanor menacing and burglary. The Court agrees with Defendants. Although Sergeant Pilya of the Critical Incident Response Team testified that he was investigating White for only menacing and burglary, at the time Frenz fired, he was aware that White had entered an occupied apartment building wielding a knife and that White had some sort of confrontation with a police officer which resulted in the officer discharging his weapon. (Doc. 83-2, Frenz Dep. at 94).

The Court finds that the appropriate method to analyze the severity of the crimes by White is to consider the information available to the reasonable officer at the time of the shooting and which crimes the officer had probable cause to believe the suspect committed based on the

information obtained before the shooting.  *Goodrich v. Everett*, 193 F. App'x 551, 555 (6th Cir. 2006).  This factor is evaluated to determine if the severity of the crime makes it more or less likely that an officer would have to use force to apprehend the suspect.  *Id.* (finding that reasonable belief that suspect committed aggravated domestic assault weighed in favor of the use of force).  As this factor is ultimately designed to instruct the Court on the reasonableness of the officer's decision at the time he made it, a post hoc accounting of the crimes actually committed would require the Court to use hindsight when every case in the Sixth Circuit and in the Supreme Court warns against just such an approach.  The Court agrees that at the time Frenz encountered White, based on the information he had at the time, it was reasonable for Frenz to believe that White had committed aggravated burglary under Ohio Revised Code § 2911.11(B) and aggravated assault under Ohio Revised Code § 2901.11(A)(2), two potentially violent crimes. This factor weighs in favor of the use of force.

### b.    Actively Resisting Arrest and/or Fleeing

Defendants argue this also weighs in favor of Frenz because White had "attacked Alderman with his knife, *and* he had already evaded arrest by flight when he ran away from Alderman."  (Doc. 57, Mot. Summ. J. at 28).[13]  Plaintiff argues that "Defendants concede that they did not use deadly force because Jason White was a fleeing felon or evading capture." (Doc. 86, Mem. Opp. at 38 (citing Doc. 83-3, McKee Dep. at 60)).  However, Plaintiff correctly also notes that the Sixth Circuit applies a segmented approach to analyzing excessive force claims.  (Doc. 96-1, Surreply at 10 (quoting *Greathouse*, 433 F. App'x at 372)).  Accordingly,

---

[13] There is no evidence in the record that White ever actually attacked Alderman or any other officer.  In fact, Alderman even clarifies that at the time of the incident he told another officer that White "tried to attack him with a knife."  (Doc. 83-1, Alderman Dep. at 90).  At best, White's confrontation with Alderman could be characterized as an potential attack and neither Frenz nor McKee stated they were aware of an attack, just that they were aware of a confrontation.

McKee's testimony regarding his beliefs is irrelevant in an analysis of Frenz's use of force. *See Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 217 (2015) ("To start, '[e]ach defendant's liability must be assessed individually based on his own actions.'" (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010))).

The Court agrees with Defendants that this factor weighs in favor of the use of force by Frenz. Again, Frenz was aware that Alderman had some sort of confrontation with White, that White then ran away from Alderman and into a new apartment complex, that White continued to refuse to follow Frenz's commands, and that White then, at a minimum was attempting to flee out of the enclosure with a knife in his hand.

### c. Immediacy of the Danger

Plaintiff repeatedly states that "a reasonable fact finder could find that Jason White was merely moving away from Frenz and Kracht and posed no imminent deadly or serious threat to anyone." (Doc. 86, Mem. Opp. at 41). However, there is no evidence that rebuts the testimony of both Kracht and Frenz that White first moved in Frenz's direction holding a knife, refusing orders to drop the knife and show his hands. While it is certainly possibly that White was merely attempting to leave the enclosure, it is undisputed that his first move—once confronted by Frenz and Kracht—was a move toward Frenz. In the Sixth Circuit, in the absence of overt statements by White to the officers, White's actual motives for his movements are not relevant to this inquiry because they are not known to the reasonable officer at the time of the incident. *See Murray-Ruhl*, 246 F. App'x at 350 ("the subjective intent of the victim—unavailable to the officers who must make a split-second judgment—is irrelevant to the question whether his actions gave rise to a reasonable perception of danger."); *see also United States v. Serrata*, 425 F.3d 886, 905 (10th Cir. 2005) (holding the victim's "state of mind is irrelevant, as the force

would have been excessive regardless of [the victim's] subjective state of mind."); *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997) (finding that "evidence outside the time frame of the shooting is irrelevant and prejudicial" and excluding the victim's subjective intent to commit suicide by police).

The same analysis applies to the evidence provided by Plaintiff regarding White's mental history and previous history that day. Although the Court understands the possibility that White may have been in some sort of mental distress, his past history is irrelevant to the officer's use of force unless they knew of his past history. The Sixth Circuit has discussed this specific issue and found that where the officers are not affirmatively aware of a suspect's actual mental disability, "the actual mental illness of [a suspect] cannot be considered [in an excessive force analysis] except to the extent that it seemed that he could have been mentally disturbed." *Sheffey v. City of Covington*, 564 F. App'x 783, 795 (6th Cir. 2014). Notably, in collecting cases, the Court found that the defining characteristic of the cases in which courts found that mental health was important were that the officers definitively knew of the mental illness, that the arrestee was known to be unarmed in most of the cases, and that the arrestee had made no attempt to resist or attack the officers. *Id.* at 795–96 (collecting cases). The Court finds that the same analysis in *Sheffey* applies here: "the mental illness of [White] should be considered . . . from the viewpoint of what the officers knew and could perceive at that time of the incident." *Id.* at 796. The Court is hesitant to require a police officer to recognize mental illness or distress, to identify its type, and to determine if a person will be violent or not on the basis of the person's speech (or lack thereof) or the look of the person's eyes. There are too many different types of mental illness which affect people in numerous different ways for the Court to demand that an officer be able to

recognize mental distress and determine if a suspect will be non-violent on the minor visual and auditory cues present in this case.

As to immediacy, the Court agrees with Defendants that *Lopez v. City of Cleveland* is inapplicable to Frenz's shooting. In *Lopez*, the Sixth Circuit analyzed a case where police officers approached a machete wielding suspect who was speaking to a family member. 625 F. App'x 742, 744 (6th Cir. 2015). The officers alleged that they saw the decedent make a move toward the family member with the machete raised over his head in a threatening manner. *Id.* However, there were three non-officer witnesses who alleged that the decedent turned away from the family member, that he only raised the machete to threaten himself, that he never raised it at all, and/or that he did not turn in any direction. *Id.* The Sixth Circuit found that there was a question of fact whether the decedent had in fact moved towards the family member while holding the machete. *Id.* at 746. Accordingly, the Court decided that "[t]hose disputes go to the heart of whether it was reasonable for Defendant Officers to use deadly force." *Id.* at 747. Notably, the Court did not hold that force would be unreasonable if the officers' version of the facts was correct. In this case, there is no question of fact about White's movement immediately before Frenz fired, meaning the *Lopez* decision is unhelpful in determining whether Frenz's shooting was reasonable.

Plaintiff argues Frenz was never in danger because White was not within striking distance at the time Frenz shot, that Frenz had cover from the fence, and that there were twenty to thirty officers in the area. (Doc. 86, Mem. Opp. at 42). There is nothing in the record which rebuts Frenz's testimony that White was six to eight feet from Frenz when Frenz fired. (Doc. 83-2, Frenz Dep. at 70, 78). Plaintiff does not cite to any case law which requires that a victim be within striking distance before an officer fires his weapon. In fact, in *Chappell*, the Sixth Circuit

explicitly held that a knife wielding suspecting moving toward an officer with the knife, "held up while ignoring their commands to drop the knife; and that they believed he was trying to attack them and, at a distance of less than seven feet, posed an imminent threat of serious bodily harm." *Chappell*, 585 F.3d at 910. The decedent in *Chappell* also had a mattress between him and the officers but the Sixth Circuit applied qualified immunity anyway, noting that the mattress would have posed "little impediment to a knife-wielding assailant." *Id.* at 911. The Court finds that those circumstances are sufficiently similar to the case at hand to warrant a finding of reasonableness.

Plaintiff's argument regarding the presence of other officers in the area is not relevant to whether White was a threat to Frenz when White closed to between six and eight feet. Plaintiff does not explain how twenty to thirty other officers in the area who were not present for the encounter could have stopped White from reaching Frenz if White was attacking Frenz. The Court finds that Frenz was under no duty to wait for assisting officers to arrive before firing his weapon because the totality of the circumstances support that, at a minimum, reasonable officers could have differed about the use of force. Plaintiff also argues that Kracht did not find it reasonable to fire at White and argues that Kracht was "faced with the identical circumstances as Frenz." (*Id.*). As previously noted, Kracht was not faced with the same circumstances as Frenz because when White started moving from within the enclosure, he moved toward Frenz and away from Kracht.[14]

Based on the similarities in *Chappell*, even if Frenz's use of force was unreasonable, when the Court is in a legal gray area, "the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight."

---

[14] Defendant also correctly notes that "immunity should be recognized 'if officers of reasonable competence could disagree on the issue,'" *Mullins*, 805 F.3d at 765 (quoting *Malley*, 475 U.S. at 341).

*Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015) (citing *al-Kidd*, 563 U.S. at 131). Accordingly, Frenz is entitled to qualified immunity for his use of force against White because Plaintiff has failed to establish either prong of the two-part test.  Summary judgment as to Plaintiff's excessive force claims against Frenz is **GRANTED**.

> 2.      **Officer McKee**

Officer McKee's interaction with White occurred in three distinct circumstances and the Court agrees with Plaintiff that each must be segmented and analyzed individually.  However, the Court notes that at each stage, the Court must analyze each incident with an eye on McKee's knowledge of Alderman's encounter with White, of Frenz's encounter with White, and McKee's own previous encounter(s) with White.

> a.      **McKee's First Shooting**

It is undisputed that McKee first shot White in the back while White was running away from McKee, Frenz, and Kracht.  The Court notes that for McKee's first set of shots, only one of the three factors contains analysis that is significantly different than the analysis the Court completed for Frenz's shots.  McKee was aware of the same facts regarding the potential crimes committed by White and there is no doubt that White was actively fleeing from Frenz, McKee, and Kracht at the time McKee fired his first set of shots.  The first two elements again weigh in favor of reasonableness.  Accordingly, only the immediacy of the threat factor need be analyzed in depth.

Defendant relies on *Tennessee v. Garner* for the proposition that "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  471 U.S. 1, 11 (1985).  Plaintiff again relies on *Lopez* as controlling in this case, stating

that similar to *Lopez*, this case involves a suspect who was not an immediate threat to McKee or others. (Doc. 86, Mem. Opp. at 43).

In *Garner*, the Supreme Court held that an officer who shot and killed an unarmed teenage fleeing suspect solely to prevent escape was an unreasonable seizure and violated the teenager's constitutional rights. 471 U.S. at 20–22. The Court held that the officer "did not have probable cause to believe that [the teenager], whom he correctly believed to be unarmed, posed any physical danger to himself or others." *Id.* The question for this Court is whether McKee had probable cause to believe that White posed immediate physical danger to others as McKee admits White posed no threat to McKee at the time of McKee's first shooting. There are major factual differences between the officer's use of force in *Garner* and McKee's use of force. In *Garner*, the officer correctly believed that the teenager was unarmed and was responding as one of two officers. *Id.* The officer believed that teenager would escape if he did not shoot him before he jumped a fence. *Id.* In this case, McKee was one of twenty to thirty officers on the scene, White was armed while he was fleeing, and had previously had two encounters with other officers who had fired their weapons at him.[15] However, McKee also knew that White was wounded as he saw White's blood splatter on to the wall. (Doc. 83-3, McKee Dep. at 78).

This case is not as clear-cut as *Garner* where the officer subjectively knew that the fleeing suspect was unarmed, nor is it as obvious as cases in this circuit and others where Courts held that deadly force against a fleeing suspect was reasonable or those where an officer acted with deadly force in the defense of others. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023–24, (2014) (finding no constitutional violation where officer ended a "lengthy, high-speed pursuit

---

[15] As the Sixth Circuit has pointed out in a similar case, "[t]he main points that distinguish *Garner* . . . are that the suspect in *Garner* was (1) deemed to be unarmed; (2) non-violent; (3) non-dangerous; (4) a minor; and (5) the suspect did anything but confront the police." *Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000).

that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby."); *Livermore*, 476 F.3d at 401–06 (finding officer's use of deadly force was reasonable where officer fired at suspect who had helped caused a standoff and had a rifle drawn after agreeing to surrender); *see also Troupe v. Sarasota County*, 419 F.3d 1160, 1168 (11th Cir. 2005) (finding qualified immunity applied to the use of deadly force to stop someone who previously endangered police even if, in hindsight, the facts show that the police could have escaped unharmed); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (finding that defendant officer had probable cause to believe that a suspect fleeing in a truck posed an imminent threat of serious physical harm when the officer had seen the truck run motorists of the road and threaten the safety of others); *but see Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007) (holding that an officer was not entitled to qualified immunity where he fired on fleeing suspect where officer did not believe the suspect was armed and the alleged crimes were resisting arrest and dealing crack cocaine).

This case comes down to whether a reasonable officer would believe—or that reasonable officers could differ—that White was an immediate threat to others in the area. The Supreme Court has cautioned that an officer's actions may fall "in the 'hazy border between excessive and acceptable force.'" *Brosseau*, 543 U.S. at 200–01 (quoting *Saucier*, 533 U.S. at 206). This is such a case. In *Plumhoff*, the Supreme Court found the use of force reasonable during a high speed chase where, "at the moment when the shots were fired, all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Plumhoff*, 134 S. Ct. at 2022. Thus, the Court finds that even though there were no other officers or civilians in the immediate vicinity of White, McKee's first use of force was reasonable because

reasonable officers could differ on whether or not White posed an immediate danger to those in the area.  *Mullins*, 805 F.3d at 765.  Further, this case falls into the sort of gray area that means it would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and thus that the right was not clearly established.  *Saucier*, 533 U.S. at 202.  McKee is entitled to qualified immunity for his first set of shots.  Summary judgment as to that claim is **GRANTED**.

### b.    McKee's Second Shooting

At the time of the second shooting by McKee, White had stopped running and turned to face McKee as he came through a breezeway.  Defendants argue that White's presence was an immediate threat because he was refusing to drop the knife, was holding it with the blade up, and was glaring at McKee.  Defendants argue that White could have closed the 10 to 15 feet in "fractions of a second" and that "McKee could not fully rely on his firearm to stop a knife attack at such close range."  (Doc. 57, Mot. Summ. J. at 56–57).  They further argue that McKee had only a few seconds to make the determination about the proper amount of force and that the combination of all these factors justify his use of force.  (*Id.*).  Plaintiff argues that *Lopez* considered a similar situation and thus forecloses any of McKee's arguments.

Again, only a cursory review of the first two elements is necessary at this juncture.  The first element regarding the alleged crimes still weighs in favor of McKee's use of force.  The second element in this situation does not.  White had stopped running and turned to face McKee while standing still but still refused to obey any commands.  The second factor favors neither party.

On reasonableness, the Court again looks to *Lopez* which held that there was a question of fact about whether or not the suspect had turned toward a bystander before the police shot

him. Although the Court did not explicitly hold that the officers' actions were unreasonable, the Court essentially held that had the machete-wielding suspect not moved toward the bystander, the shots would have been unreasonable. It is undisputed that in this case, White did not move towards McKee before McKee shot him.

In *Mace v. City of Palestine*, the Fifth Circuit held that an officer did not act unreasonably when he shot a suspect holding a sword. 333 F.3d 621, 625 (5th Cir. 2003). The suspect was brandishing the sword and making punching motions with the sword while eight to ten feet from the officers. *Id.* at 623. While still eight to ten feet away, the suspect turned toward the officers and raised the sword. *Id.* At that time, an officer shot him in his right arm. *Id.* The suspect then attempted to flee, fought off an attack dog, was pepper sprayed, and eventually passed away from his wounds. *Id.* The Fifth Circuit noted that the suspect refused commands, was acting agitated and continued to make punching motions with the sword. *Id.* at 624. The court also noted that the relatively tight quarters of the scene reduced the officers' ability to retreat or keep the suspect from harming others in the area. *Id.*

This case shares similarities with both *Lopez* and *Mace*. Similar to *Mace*, White was holding the knife in an aggressive manner and White was not obeying any of McKee's commands to drop the knife. Like *Lopez* and *Mace*, there is no dispute that White never moved toward McKee at the time of the second shooting. But material differences also exist. Unlike *Mace*, McKee was not in a confined space, was fifteen feet away, and he did have room to retreat. Unlike *Lopez*, McKee was aware that White had already had two confrontations with police earlier in the night. The Court notes that the time between McKee's second set of shots and his arrival on the scene was very short and that he did not have a great deal of time to make a decision. However, the fact that the situation unfolds quickly does not by itself legitimize the

use of deadly force. *Mullins*, 805 F.3d at 768 (citing *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008)). Yet, the Court is again reminded that "officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed." *Untalan*, 430 F.3d at 315–16 (finding that even if the suspect had dropped the knife he was holding, officers had to make a split second decision if suspect was a threat).

The Court finds that based on the evidence and the Court's obligation not to impose hindsight on split-second decisions, a reasonable officer could reasonably have believed that White was an immediate threat even though he was fifteen feet away and standing still. Although other officers were in the area, there is no evidence that McKee was aware where any of the other officers were located other than Kracht and Frenz, who he knew were behind him but at an unknown distance. Accordingly, their general presence in the area does not show that any were close enough to truly provide support should White have decided to charge McKee. Further, although it is now clear that McKee could have retreated because he was in an open space, there is no evidence that he was aware of his surroundings at that time. It was dark, in an apartment complex and a suspect who had two previous confrontations with officers had stopped running to face him while holding a knife. This is an extremely close case but the Court finds that although McKee's second shooting may not have ultimately been necessary, it was not an unreasonable use of force. McKee is entitled to qualified immunity for this round of shots and summary judgment as to that claim is **GRANTED**.

### c. McKee's Third Shooting

Regarding the third set of shots fired by McKee—while White was either on the ground or attempting to stand back up—Defendants argue that a reasonable officer would have recognized that White was still not subdued and therefore, the threat was not yet over.

Defendants rely on a footnote from *San Francisco v. Sheehan* for the proposition that the position of a suspect on the ground is not material if the suspect is not subdued. 135 S. Ct. 1765, 1771 n. 2 (2015).

In *Boyd v. Baeppler*, the Sixth Circuit analyzed a case where an officer shot a suspect who was already on the ground due to shots from another officer. The Court found that the officer was entitled to qualified immunity where he shot the decedent seven times even after the decedent had been already brought down by another officer. 215 F.3d 594, 602–04 (6th Cir. 2000). However, the facts in that case are distinct from this case. In *Boyd*, the suspect, while down on the ground, "lifted his torso and turned to point his [gun]" at another officer before he was shot while on the ground. *Id.* Although McKee stated that White continued to stare at him while attempting to get up, there is no comparison between a suspect pointing a gun at an officer and a suspect holding a knife while staring at an officer.

In *Sheehan*, the Supreme Court analyzed a case where the plaintiff was in a mental health facility when she threatened to kill an employee. *Sheehan*, 135 S. Ct. at 1769–70. The police came and entered her room where the plaintiff then threatened them with a kitchen knife. *Id.* at 1770. The officers retreated and called for backup then re-entered the room because they feared she would gather more weapons or flee out of a window. *Id.* The officers re-entered the room and the plaintiff admitted she was intending to resist arrest using the knife. *Id.* at 1771. One officer pepper sprayed the plaintiff but she did not drop her knife. *Id.* As she closed on the second officer, he shot her twice and she may have fallen to the ground. *Id.* While the plaintiff was on the ground, she continued to threaten the second officer with the knife while he was cornered in the small room. *Id.* The first officer then shot her again. *Id.* The Court found the dispute about whether the plaintiff was on the ground was immaterial because "she was certainly

not subdued." *Id.* at 1771 n. 2 (quoting *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1230 (9th Cir. 2014)).

The Court acknowledges that the footnote in Sheehan states that the position of a suspect on the ground does not make the use of force unreasonable *per se*, but this case shares few important similarities. *Id.* In this case, McKee had witnessed Frenz shoot White and had fired his own gun at White two times meaning he knew White was injured. The Court disagrees that a reasonable officer would have felt immediately threatened by a knife wielding suspect on the ground ten to fifteen feet away suffering from at least one known gunshot. Regardless of whether White was prone or attempting to push himself up, McKee was in an open field facing a man on the ground with a knife and rather than retreat to a safe position, take note of his surroundings, or call for backup, McKee shot White again while White was on the ground and fatally wounded him. Accordingly, Plaintiff has presented sufficient evidence, which if believed, could support a finding that McKee's third set of shots were unreasonable.

Further, as Plaintiff correctly argues, *Lopez* confirmed that on November 17, 2013, "the law was clearly established that officers could not use deadly force unless they had probable cause to believe that an individual posed a serious risk of harm to officers or others." *Lopez*, 625 F. App'x at 747 n. 2 (citing *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006)). Accordingly, McKee is not entitled to qualified immunity for his third set of shots fired at White and summary judgment as to that claim is **DENIED**.

### 3. Deliberate Indifference

Defendants next argue that McKee and Frenz are entitled to qualified immunity on Plaintiff's deliberate indifference claims. Defendants argue that this claim arises under the Fourteenth Amendment Due Process Clause which only requires the summoning of medical

help.  (Doc. 57, Mot. Summ. J. at 34–35).  Defendants further argue that White passed away from the lethal gunshot within a minute of being shot for the final time and that no amount of medical care by the officers would have saved him.  (*Id.* at 35).  Plaintiff argues that the officers knew of and disregarded a substantial risk of harm to White and that causation is not an element for a claim of deliberate indifference.

The Constitution forbids the "deliberate indifference to serious medical needs of prisoners" under the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Although not explicit in the Eighth Amendment, this restriction is evident when deliberate indifference is considered the "'unnecessary and wanton infliction of pain.'"  *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  Accordingly, "intentionally denying or delaying access to medical care" violates the constitutional rights of a prisoner.  *Id.* at 104–05.  Pretrial detainees are also protected from deliberate indifference via the Fourteenth Amendment.  *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

The Court evaluates a deliberate indifference claim by reviewing both subjective and objective components because "[d]eliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety."  *Watkins*, 273 F.3d at 686 (citing *Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994)).  "The objective component is that the plaintiff must 'show the existence of a sufficiently serious medical need.'"  *Linden v. Piotrowski*, 619 F. App'x 495, 500 (6th Cir. 2015) (quoting *Phillips v. Roane Cty.*, 534 F.3d 531, 539 (6th Cir. 2008) (internal quotations omitted)).  The subjective component consists of three parts which Plaintiff may show by circumstantial evidence: (1) that the officers subjectively perceived facts from which to infer substantial risk to the detainee; (2) that the

officers actually drew the inference; and (3) that the officers then disregarded that substantial risk. *Phillips*, 534 F.3d at 540 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Plaintiff relies on both *Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012) and *Eibel v. Melton*, 904 F. Supp. 2d 785 (M.D. Tenn. 2012) for the proposition that an officer does not discharge his duty to render medical aid solely by calling for aid for a victim of the police use of force. Defendants rely on *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1098 (6th Cir. 1992), arguing that a police officer discharges his duty to render medical aid by promptly calling for medical help.

In *Rich*, a prisoner hung himself in his prison cell. 955 F.2d at 1094. An officer came into the cell, saw the prisoner hanging and called for medical assistance. *Id.* Paramedics arrived in the cell one minute after the call for medical help was logged but the decedent was still hanging. *Id.* The paramedics got the prisoner on the ground but he had already suffered permanent mental and physical damage. *Id.* The Court found that the officer was entitled to qualified immunity because the police officers did not intentionally deny or delay the prisoner's access to medical care. *Id.* at 1098. Further, the Court noted that "[t]he record in this case clearly supports the conclusion that upon discovering [the prisoner] hanging in his cell, the defendant police officers reacted immediately by calling for the paramedics, and that the paramedics arrived within minutes." *Id.*

Before *Scozzari*, the Sixth Circuit had another opportunity to consider a deliberate indifference claim where the officers in question struck a suspect with a baton in his back, legs, and arms, pinned him down with his arms under his chest, placed him in a head wrap, and used a shoulder pressure point "compliance technique" to subdue him. *Estate of Owensby v. City of*

*Cincinnati*, 414 F.3d 596, 600 (6th Cir. 2005). After Owensby was handcuffed and prone, one of the officers kneed Owensby in the back, lifted his head up, and another officer sprayed mace into Owensby's eyes and nose from six inches away. *Id.* At least one of the officers continued to repeatedly strike Owensby in the back. *Id.* As they placed Owensby in a cruiser, one of the officers continued to beat Owensby. *Id.* The officers locked the doors and although one officer questioned whether or not Owensby could breathe, they made no attempt to render aid and instead greeted each other, secured dropped items, checked their uniforms, and talked about how Owensby appeared to be hurting a great deal. *Id.* at 600–01. Six minutes later, a new officer arrived and checked on Owensby, removed him from the car, and called EMTs which arrived four minutes later. *Id.* at 601. The Sixth Circuit denied the officers qualified immunity, finding that there was evidence of their indifference in the six minutes where they did anything but help Owensby even though they had viewed him in significant distress. *Id.* at 603. Further, the Court found that the right to care was clearly established and stated that Owensby's prior flight and confrontation with the police was irrelevant to the analysis. *Id.* at 604.

In *Scozzari*, the Sixth Circuit considered a case where an officer shot the plaintiff's decedent then called for medical care. 454 F. App'x at 465. However, when the ambulance arrived, the officers had not secured the scene and were preventing the medics from accessing the decedent. *Id.* The officers then asked the medics to work around the evidence on the ground once they had arrived. *Id.* The Sixth Circuit held that "[r]easonable officers would have known, based on this Circuit's precedent, that the obligation to provide adequate medical care to an injured detainee is not discharged merely by promptly calling for assistance, but extends to ensuring that medical responders are able to access the victim without unreasonable delay." *Id.* at 466. The Court noted that "*Owensby* involved not only the failure to summon medical care,

but also the failure to provide medical care . . . " but the Court did not discuss *Rich*. *Id.* at 465–66. The Sixth Circuit also noted that there was a question of fact whether the officers were arranging weapons around the decedent and asking witnesses to view the decedent's body near the weapons rather than securing the scene. *Id.*

Defendant argues that reliance on *Scozzari* is misplaced because the officers in that case did not secure the scene and thus did not discharge their duties to the decedent. Defendant does not discuss *Owensby* or *Scozzari's* implicit finding that there is a duty to both summon and provide medical care. The Sixth Circuit recently considered a case which is not entirely analogous to this case but the Sixth Circuit's analysis of *Owensby* is still helpful. *Linden*, 619 F. App'x at 502. In *Linden*, officer Piotrowski and officer Zayto arrived on a scene where multiple persons were suffering from gunshot wounds. *Id.* at 496–97. The officers allegedly failed to direct paramedics to Ronald Black, one of the gunshot wound victims who later passed away. *Id.* The Court noted the defining characteristics of *Owensby* that were not present in *Linden*: (1) "Black, unlike Owensby, had no visible manifestations of his injury;" and (2) "[u]nlike the officers in *Owensby*, Piotrowski and Zayto did not cause the decedent's injuries and did not have the same reason to know about their extent." *Id.* at 503. Both of those factors in this case are similar to *Owensby*. McKee saw his final shot enter White's chest and saw blood coming out of the wound and Frenz saw White smear blood on the wall after his volley of shots. Further, both officers were responsible for White's wounds. Last, the delay between the final shots in this case and the arrival of paramedics—around ten to fifteen minutes—is at least as long as or longer than each of the cases cited above and both officers still chose not to provide medical care.

Although Defendants argue that Frenz and McKee did not have the subjective state of mind to determine that White was in serious need of medical care, Defendants cite no evidence

in the depositions or affidavits of McKee and Frenz that they knew their medical care would be futile.  A medical examiner's post hoc opinion that medical care which was not actually rendered would not have been effective is not relevant in evaluating the state of mind of Frenz and McKee when both admitted they knew White was injured and that both officers knew they shot him.  (Doc. 83-2, Frenz Dep. at 113; Doc. 83-3, McKee Dep. at 86–87).   Despite Defendants assertions, the futility of their help has no relevance to Frenz and McKee's subjective belief at the time, but rather improperly asks the Court to graft a causation element into the analysis by assuming that the medical examiner's futility determination constitutes the officers' subjective state of mind at the time they chose not to provide medical care.   There is sufficient circumstantial evidence to show that both officers perceived facts allowing them to infer a substantial risk to White, that both drew the inference that the risk could cause harm, and then that both disregarded the risk.

As to the right being established, *Owensby* held that "in general, the Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established."  414 F.3d at 604.  The facts in this case are sufficiently similar to *Owensby* for the Court to hold that a reasonable officer would have known they could not ignore White's urgent medical needs as he was lying in the grass solely because an officer had called for an ambulance which did not arrive for at least 10 minutes.   Accordingly, the officers are not entitled to qualified immunity for their decision not to provide medical care and summary judgment as to the deliberate indifference claim is **DENIED**.

## C.    *Monell* Liability

Next, Columbus moves for summary judgment on Plaintiff's municipal liability claims under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Plaintiff argues that Columbus is liable for both its failure to train/supervise the officers and for having customs or

policies which caused the alleged constitutional violations. Columbus argues that Plaintiff has not identified any policy which caused the violations and that *Monell* liability should not attach to any claim based on acts the Court found constitutional.

The *Monell* decision made clear that local government units could be held liable for § 1983 claims, but that "§ 1983 did not support *respondeat superior* liability, reasoning that 'Congress did not intend municipalities [and other local government units] to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Monell*, 436 U.S. at 691). A plaintiff can identify one of four methods "[t]o show the existence of a municipal policy or custom leading to the alleged violation:" "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1381 (2016) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

"A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 692–94). "In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Id.* (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397412 (1997)).

Plaintiff alleges that McKee's shots at White while White was on the ground were due to the Columbus' policy, custom, practice, and/or training directive to shoot suspects who are on

the ground.  Plaintiff points to a passage from Thomas Paige's deposition[16] in which he stated that an officer can use lethal force on a person on the ground who has a knife as long as the officer perceives the person as a threat, regardless of the distance between the officer and the person on the ground.  (Doc. 84-7, Paige Dep. at 103).  Paige stated that in the situation where an officer is fifteen feet away from a person with a knife who has been shot, the City of Columbus policy allows the officer to shoot that person as the person attempts to stand up as long as the officer perceives the person is a threat.  (Doc. 84-7, Paige Dep. at 103–05).  The risk of this policy is that an officer is empowered to shoot a suspect on the ground when the suspect is well out of striking distance so long as the officer feels threatened.  An injured suspect on the ground with an edged weapon is not an immediate threat to an officer who is fifteen to twenty feet away, even if the suspect is attempting to get back up in most if not all circumstances.  The clear implication of Paige's testimony is that it invites an officer to make an unconstitutional decision to use lethal force on a person on the ground because the person is a threat—even if not an immediate one.  Defendants cite *Sheehan* to argue that this policy is constitutional because the Supreme Court found the use of force in *Sheehan* constitutional, but *Sheehan* involved a suspect who was still within close proximity to the officer, while the suspect was still holding a knife and threatening the cornered officer.  *Sheehan*, 135 S. Ct. at 1771 n. 2.  Accordingly, the Court finds that summary judgment on Plaintiff's *Monell* claim regarding excessive force is **DENIED**.

To the extent Plaintiff seeks *Monell* liability against Columbus for the officers' failure to provide medical care, summary judgment as to that claim is **GRANTED** as Plaintiff has identified no policy, custom, training directive, or post-hoc ratification of the officer's decision not to provide medical care.  Additionally, summary judgment as to Plaintiff's claims against

---

[16] Paige is the Defendants' expert in police procedure and was involved in McKee's training on the use of force. (Doc. 84-7, Paige Dep. at 39–40).

Columbus for Frenz's shots and McKee's first two volleys is **GRANTED** because the Court found no underlying constitutional violations.

### D. State Law Immunity for Frenz and McKee

Frenz and McKee next move to dismiss Plaintiff's state-law claims, arguing that Frenz and McKee are immune under Ohio law.  Frenz and McKee argue that Ohio Revised Code § 2744.03(A)(6) provides presumptive immunity and that none of the three exceptions to that immunity apply.  Plaintiff argues that their actions fall under Ohio Revised Code § 2744.03(A)(6)(b), which removes an officer's immunity if he acted "with malicious purpose, in bad faith, or in a wanton or reckless manner."

The Sixth Circuit has held that when a plaintiff fails "to demonstrate that defendants' conduct was objectively unreasonable, it follows that she has also failed to demonstrate that defendants acted with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' such as is required to avoid statutory immunity under Ohio law." *Chappell*, 585 F.3d at 916 (citing Ohio Rev. Code § 2744.03(A)(6)(b); *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002)).  Accordingly, the Court finds that Frenz is entitled to immunity for his use of force, that McKee is entitled to immunity for his first and second uses of force, and therefore **GRANTS** summary judgment as to the state-law claims arising from those incidents.

However, because the Court found that qualified immunity did not apply to McKee's third use of force or McKee and Frenz's decision not to provide medical care, immunity also does not attach to the analogous state law claims.  Defendants agreed that Plaintiff's state-law claims rise and fall with the Court's qualified immunity analysis.  (Doc. 95, Reply at 37). Accordingly, summary judgment as to Plaintiff's state-law claims against Frenz and McKee which are based on the failure to provide medical care and against McKee for the third use of force is **DENIED**.

**E.      State Law Immunity for Columbus**

Columbus argues that it is immune from Plaintiff's state-law claims under Ohio Revised Code § 2744 which grants political subdivisions presumptive immunity from tort claims involving injury or death caused by the political subdivision or one of its employees in connection with a government or proprietary function.  Columbus argues that none of the exceptions to immunity apply.  Plaintiff did not respond to this argument.

Defendant is correct that policing is a governmental function, that Columbus is a political subdivision, and that this claim involves injury or death such that presumptive immunity applies. *See* Ohio Rev. Code § 2744.02(A)(1); Ohio Rev. Code § 2744.01(C)(2)(a) ("A 'governmental function' includes . . . the provision . . . of police . . . services or protection").  Ohio Revised Code § 2744.02(B) sets forth the exceptions to that immunity and Columbus is again correct that none of the following apply: (1) injury caused by the negligent operation of a motor vehicle; (2) injury caused by negligent performance with respect to proprietary (not governmental) functions; (3) injury caused by failure to keep roads in good repair; (4) injury caused by negligence on grounds of building used for governmental function, *i.e.* courthouses, jails, and office buildings; and (5) injury where liability is specifically imposed on the subdivision by another Ohio Revised Code section.  Ohio Rev. Code §§ 2744(B)(1)–(5).  Accordingly, Columbus is immune from Plaintiff's state-law claims and summary judgment as to those claims is **GRANTED**.

## IV.      CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.  Plaintiff's Motion for Leave to File a Surreply is **GRANTED**.

The claims remaining in this case are an excessive force claim against McKee, the deliberate indifference claims against McKee and Frenz, the *Monell* claim against Columbus for McKee's use of force, the state-law claims against McKee arising out of his third use of force,

and the state-law claims against Frenz and McKee arising from their failure to provide medical care.  In light of this decision, the parties shall contact Magistrate Judge Deavers within **14 days** to arrange for participation in an upcoming Settlement Week.  The Clerk shall **REMOVE** Documents 57 and 96 from the Court's pending motions list.

**IT IS SO ORDERED.**

__ /s/ George C. Smith__
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**